1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BP WEST COAST PRODUCTS LLC, | CASE NO. 12CV665 JLS (KSC) and 12CV887 JLS (KSC) |
| Plaintiff and Counter-Defendants, | |
| vs. | **ORDER DENYING MOTIONS FOR TEMPORARY RESTRAINING ORDER** |
| CROSSROAD PETROLEUM, INC. et al., | |
| Defendants and Counter-Plaintiffs, | |
| vs. | |
| THRIFTY OIL CO., | |
| Counter-Defendant. | |
| AND RELATED CONSOLIDATED ACTIONS | |

Presently before the Court are three factually and legally similar motions for temporary restraining orders ("TRO") brought by Defendant/Counter-Plaintiff Franchisees against Plaintiff/Counter-Defendant BP West Coast Products, LLC ("BPWCP") and Counter-Defendant Thrifty Oil Co. ("Thrifty"), in two related cases, *BP West Coast Products, LLC v. Crossroad Petroleum, Inc.*, 12cv665 JLS (KSC) [hereinafter "the lead case" or "665"], and *BP West Coast Products, LLC v. Meetra, Inc.*, 12cv887 JLS (KSC) [hereinafter "the related case" or "887"].[1] Also before the Court are the associated oppositions and replies. A hearing on the motions was held on April 17, 2012. Having considered the parties' arguments and the law, the Court **DENIES** each of the motions.

---

[1] *BP West Coast Products, LLC v. Meetra, Inc.*, 12cv887 JLS (KSC) is consolidated with *2United Oil LLC v. BP West Coast Products LLC*, 12cv886 JLS (KSC), and *Crossroad Petroleum, Inc. v. BP West Coast Products, LLC*, 12cv888 JLS (KSC).

**BACKGROUND**

**1. Procedural Background**

On March 18, 2012, BPWCP filed a complaint for declaratory relief under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.*, in the Southern District of California, (Compl., 665 ECF No. 1), as well as every other judicial district in California.[2] The Franchisees filed their own complaints in the Central District of California as well, *2United Oil LLC v. BP West Coast Products, LLC*, 12cv886 JLS (KSC) (many franchisee plaintiffs), and *Crossroad Petroleum, Inc. v. BP West Coast Products, LLC*, 12cv888 JLS (KSC) (Crossroad Petroleum, Inc. ("Crossroad") only), seeking relief against both BPWCP and Thrifty for violations of the PMPA. The three Central District cases were eventually consolidated into one action before the Honorable S. James Otero, and subsequently transferred to this district, where the earlier-filed 665 action was pending.

At the time the consolidated actions were transferred, the Franchisees had already filed a motion for a TRO, which is set before this Court. (TRO, 887 ECF No. 24) The Franchisees also filed a motion for a TRO in the 665 action, (Franchisee TRO, 665 ECF No. 17), and Crossroad eventually filed its own motion for a TRO in the 665 action as well, (Crossroad TRO, 665 ECF No. 31). All three motions were taken under submission following the April 17, 2012, hearing.[3]

//

//

---

[2] The related case in the Northern District of California is *BP West Coast Products, LLC v. Daven Loomba*, 12cv1357 JSC. The related case in the Eastern District of California is *BP West Coast Products, LLC v. Dhaliwalsons, LLC*, 12at338.

[3] Given the procedural obstacle course these cases traveled through prior to settling before this Court, the disorganized state of the pleadings, the number of parties involved, and the varied notice, turnover, and cash-on-delivery dates relevant to each party, the Court ordered the parties to meet and confer and jointly to file a chart listing the Franchisees, the service station numbers, addresses, date the most recent franchise agreement was entered into, effective date of the termination/nonrenewal, date(s) of notice(s) of termination/nonrenewal, which trademark the Franchisee uses, the operative COD date, and any other information that might be helpful by 5:00p.m. on April 18. (Min. Order, 665 ECF No. 37); (Min. Order, 887 ECF No. 44) By the Court's deadline, however, the parties failed to file a joint document. Rather, BPWCP and the Franchisees both filed charts, with inconsistent and incomplete information. (Franchisee Chart, 887 ECF No. 46); (BPWCP Chart 16–18, 887 ECF No. 47) As of the filing of this Order, the parties have failed to file a joint document.

**2. Factual Background**[4]

The instant case arises out of franchise and lease agreements between BPWCP and over one hundred[5] gasoline service station sites located throughout Southern California.  BPWCP leases the service station sites from a third-party owner, Thrifty, and subleases the sites to each of the Franchisees.  Beginning in April 2012, the individual ground leases between BPWCP and Thrifty will expire, and as a result BPWCP is terminating or declining to renew its franchise relationship with the sub-lessee Franchisees.  In an effort to forestall their break-up, the Franchisees have filed the instant motions for a TRO to maintain the status quo until a decision on the merits of the PMPA claims can be reached.

*A.  BPWCP-Thrifty Leases*

In March 1997, BPWCP leased from Thrifty a total of 261 service station sites.  In conjunction with this master lease, BPWCP and Thrifty also entered into separate leases for each of the individual service station sites, and a license agreement for Thrifty's trademark whereby BPWCP was entitled to sublicense the Thrifty trademark to its franchisees.

Pursuant to the BPWCP-Thrifty leases, each site was leased for an initial fifteen- or seventeen-year term, with the option for BPWCP to extend the term of all 261 site leases for three consecutive five-year terms.  To exercise the first five-year extension, BPWCP was required to notify Thrifty of its intention to do so by July 1, 2010.  The leases further provided that any failure to timely exercise an extension option would constitute an irrevocable waiver of that option as well as any succeeding option.

Prior to the July 1, 2010, deadline, BPWCP decided not to exercise its options to renew.  As a result, the leases between BPWCP and Thrifty are approaching expiration, and Thrifty has already arranged for a new lessee, Tesoro Refining and Marketing Company ("Tesoro"), to take over the service station premises.  (Franchisee TRO ¶ 10, 665 ECF No. 17)

---

[4] The facts from the Background section are taken from BPWCP's complaint in the lead case, (Compl., 665 ECF No. 1), unless otherwise indicated.

[5] The parties' charts do not agree on the identity or number of Franchisees who are parties to the instant TRO.  Without knowing who the parties are, it would be nearly impossible for the Court to draft with the necessary specificity any Order enjoining BPWCP from terminating/nonrenewing the franchise agreements.

12cv665

1   ***B.  BPWCP-Franchisee Subleases & Franchise Agreements***

2           BPWCP entered into sublease and franchise agreements with each of the Franchisees.

3   Pursuant to those agreements, the Franchisees are licensed to operate as either ARCO-branded or

4   Thrifty-branded gasoline service stations, and BPWCP subleases the service station sites to the

5   Franchisees, subject to the terms and conditions of the underlying ground lease between BPWCP

6   and Thrifty.  The franchise agreements further provided that "BPWCP is not obligated to renew

7   any underlying lease," (Compl. Ex. A, at 6,[6] 665 ECF No. 1-1 (ARCO-brand Lessee PMPA

8   Franchise Agreement); Compl. Ex. B, at 40, 665 ECF No. 1-1 (Thrifty-brand Lessee PMPA

9   Franchise Agreement)), and each of the Franchisees allegedly signed an Acknowledgment of

10  Master Lease setting forth the expiration date of the underlying ground lease, (Compl. Ex. C, at

11  71, ECF No 1-1).

12          Given BPWCP's decision not to exercise its options to renew the BPWCP-Thrifty leases, it

13  eventually sent notices of nonrenweal/termination to the Franchisees.  BPWCP indicated in those

14  notices that the franchise relationship would end upon the expiration of the underlying BPWCP-

15  Thrifty leases.  That date varies per service station site, but the terminations begin to take effect on

16  a rolling basis as of April 23, 2012.  Hence the need for the Court to issue an Order on the

17  Franchisees' request for interim equitable relief without the benefit of ample time to decipher these

18  complicated issues with admittedly far-reaching consequences.

19                                                    **LEGAL STANDARD**

20          "The overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable

21  expectation of continuing the franchise relationship." *Ellis v. Mobil Oil*, 969 F.2d 784, 788 (9th

22  Cir. 1992) (internal quotation marks omitted); *see also Humboldt Oil Co. v. Exxon Co., U.S.A.*,

23  695 F.2d 386, 388 (9th Cir. 1982) ("[In passing the PMPA,] Congress sought to reduce the

24  disparity of bargaining power between the franchisee and the franchisor and prevent harsh

25  consequences of sudden and unreasonable termination.").  In furtherance of this purpose, "the Act

26  must be given a liberal construction consistent with its goal of protecting franchisees." *Id.* at 389.

27  //

28

_____

    [6] Pin cites to the exhibits correspond to the page numbers assigned by CM/ECF.

- 4 -                                                              12cv665

The PMPA "prohibits termination of any franchise except on the basis of specifically enumerated grounds and upon compliance with notice requirements." *Id.* at 388 (citing 15 U.S.C. § 2802(a), (b)(1)). The Act provides specific enforcement provisions, including interim equitable relief. *See* 15 U.S.C. § 2805. Relevant here, "[t]he test for the issuance of a preliminary injunction under the PMPA is more liberal than that in the general run of cases." *Khorenian v. Union Oil Co.*, 761 F.2d 533, 535 (9th Cir. 1985). Thus,

> Section 2805(b)(2) of the PMPA makes the grant of a preliminary injunction *mandatory* if (A) the franchisee shows that the termination or nonrenewal of its franchise raises questions that are "sufficiently serious" to provide "a fair ground for litigation," and (B) the court determines that the "balance of hardships" tips in favor of the franchisee - that is, that the hardships that would be imposed upon the franchisor by the issuance of preliminary injunctive relief would be, on balance, less than those that would be imposed upon the franchisee upon denial of such relief.

*Hilo v. Exxon Corp.*, 997 F.2d 641, 643 (9th Cir. 1993) (quoting 15 U.S.C. § 2805(b)(2)). Pursuant to § 2805(b)(2),[7] "[o]nce a franchisee establishes that he will incur the greater hardship (which should not be difficult in most PMPA cases), he need only show a reasonable chance of success on the merits." *Khorenian*, 761 F.2d at 535. No showing of irreparable harm is required. *Id.*

## ANALYSIS

The Franchisees seek an injunction under the PMPA not only to prevent BPWCP from terminating their franchises, but also to prevent BPWCP from requiring the Franchisees to pay cash-on-delivery ("COD") for gasoline in anticipation of the closure of their service stations. Crossroad alternatively seeks an injunction against Thrifty pursuant to Federal Rule of Civil

---

[7] Section 2805(b)(2) provides:

> . . . [T]he court shall grant a preliminary injunction if —
>   (A) the franchisee shows—
>       (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
>       (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
>   (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

12cv665

1 | Procedure 65, to prevent Thrifty from turning the service station sites over to Tesoro.

2 | **1. Injunction Against Terminating the Franchises**

3 |       As an initial matter, the Court must consider whether an injunction can even be issued in

4 | these circumstances.  BPWCP and Thrifty argue that it cannot.  Specifically, they first contend that

5 | Thrifty does not fall within the scope of the PMPA because Thrifty is neither a refiner nor a

6 | distributor, and because there is no direct contractual relationship between Thrifty and the

7 | Franchisees.  (BPWCP Resp. in Opp'n to Franchisee TRO 21, 665 ECF No. 21 (citing 15 U.S.C.

8 | § 2801(1)))  And so it follows that because Thrifty—a mere commercial landlord—is not a proper

9 | party to this action, the Court is powerless to issue an injunction against BPWCP that would

10 | necessarily enjoin Thrifty as well.  (*Id.* at 22)  Moreover, even if Thrifty were a proper party, an

11 | injunction would additionally improperly enjoin Tesoro, "a stranger to this litigation."  (Thrifty

12 | Resp. in Opp'n to Franchisee TRO 23–24, 665 ECF No. 22 (citing *Kelley v. United States*, 536

13 | F.2d 897, 899 (9th Cir. 1976)))

14 | *A.  Thrifty is Not Subject to the PMPA*

15 |       Before the Court considers whether there are sufficiently serious questions going to the

16 | merits of the Franchisees' PMPA claims, the Franchisees bear the burden of showing "the

17 | franchise of which he is a party has been terminated or the franchise relationship of which he is a

18 | party has not been renewed."  15 U.S.C. § 2805(b)(2)(A)(i); *see also id.* § 2805(c) (burden of

19 | proof).  Accordingly, the Franchisees must show the existence of a franchise or franchise

20 | relationship between them and Thrifty.[8]  The Franchisees have not carried this burden.

21 |       The usual structure of a franchise relationship for the sale of motor fuel consists of a refiner

22 | who contracts with a distributor to provide the distributor with motor fuel, which the distributor in

23 | turn sells to a retailer for sale to the general public.  And pursuant to this structure, the retailer

24 | typically licenses from the refiner, or sublicenses from the distributor, the trademark that is owned

25 |

26 |      [8] Contrary to the Franchisees' suggestion otherwise at oral argument, this initial showing does
not fall under the more lenient "sufficiently serious questions" standard, but rather the Franchsiees
27 | must "show" that Thrifty is subject to the provisions of the PMPA.  This is apparent by a plain reading
of the statute, which requires a franchisee first to show termination of the franchise or nonrenewal of
28 | the franchise relationship, 15 U.S.C. § 2805(b)(2)(A)(i), and then to show that there are sufficiently
serious questions going to the merits, *id.* § 2805(b)(2)(A)(ii).

1  or controlled by the refiner, in order to sell branded fuel to the public. *Lasko v. Consumers*

2  *Petroleum of Connecticut, Inc.*, 547 F. Supp. 211, 219 (D. Conn. 1981); *see also Merlino v. Getty*

3  *Petroleum Corp.*, 916 F.2d 52, 53 (2d Cir. 1990) ("[T]he PMPA was designed to regulate the

4  marketing practices of large, vertically integrated oil companies."). It is this powerful, vertically

5  integrated structure that Congress sought to reign in by passing the PMPA, and thus it is necessary

6  that a party fit within the ambit of the Act before the Court can issue any relief. *See Denise*

7  *Petroleum, Inc. v. Ocean Petroleum, Inc.*, 32 F. Supp. 2d 534, 536 (E.D.N.Y. 1999) ("In order for

8  the provisions of the statute to apply . . . it is imperative that a franchise relationship exist between

9  the parties that are the subject of the litigation."). To that end, § 2801 of the PMPA provides

10  definitions for "franchise," "franchisor," and "franchisee," all relevant to determining whether

11  there is a "franchise relationship"—also defined—between the parties.[9]

12      Here, Thrifty contends that because it is neither a refiner nor a distributor, and because

13  there is no direct and express contractual relationship between Thrifty and any of the Franchisees,

14  Thrifty is not a proper party under the PMPA. As explained in detail below, the Court concludes

15  that Thrifty is not subject to the PMPA for one or both of these reasons.

16  *(1) Thrifty is Not a Refiner or Distributor*

17      The PMPA defines "refiner" as "any person engaged in the refining of crude oil to produce

18  motor fuel, and includes any affiliate of such person." 15 U.S.C. § 2801(5). According to the

19  Franchisees, Thrifty is a refiner by virtue of its relationship with Golden West Refining Company

20  ("Golden West"), a former gasoline refiner and subsidiary of Thrifty. The Franchisees submitted

21

22

23

24      [9] A "franchise relationship" is "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and franchisee which result from the marketing of motor fuel under a franchise." 15 U.S.C. § 2801(2). A "franchisor" is "a refiner or distributor (as the case may be) who

25  authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." *Id.* § 2801(3). Finally, a "franchisee" is "a

26  retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel." *Id.* § 2801(4).

27      The terms "refiner," "distributor," and "retailer" are also defined by the statute. 15 U.S.C. § 2801(5)–(7). Here, the parties agree that BPWCP is a refiner, as defined by the PMPA, and that the

28  Franchisees are retailers. As such, there is no dispute that there is a franchise relationship between BPWCP and the Franchisees, bringing them within the PMPA.

1  no evidence in support of this contention.[10]  In response, Thrifty asserts that Golden West is a

2  separate entity from Thrifty, and moreover that Golden West is not now—nor has it been since

3  1991—operating as a refiner.  According to Thrifty, today Golden West apparently consists only

4  of the leftovers of the Thrifty subsidiary that declared bankruptcy, and no longer refines oil.  The

5  Court ultimately finds the focus on Golden West to be misplaced, and declines the Franchisees'

6  invitation to give weight to this late-raised and unsupported contention.

7      Focusing now on Thrifty, Thrifty asserts that since 1997, "Thrifty has not been engaged in

8  the refining or distribution of motor fuel or other petroleum products in California or anywhere

9  else."  (Thrifty Resp. in Opp'n to Franchisee TRO 4, 665 ECF No. 22 (citing Decl. of Barry W.

10  Berkett ("Berkett Decl.") ¶ 2, ECF No. 22-1 (Executive Vice President for Thrifty))  Thrifty

11  asserts instead that it is merely a commercial landlord.  Again, the Franchisees offer no evidence to

12  refute Thrifty's assertions regarding its operations.  Instead, the Franchisees argue that Thrifty

13  should be subject to the PMPA on the basis of its licensing and control of the Thrifty trademark.[11]

14      The licensing of its trademark alone does not bring Thrifty within the scope of the PMPA.

15  In order to fall within the PMPA, the trademark at issue must be owned or controlled by a refiner.

16  *Merlino*, 916 F.2d at 53–54; *see also* 15 U.S.C. § 2801(1)(A) (defining "franchise" as a contract

17  under which the franchisor authorizes the franchisee to use "a trademark which is owned or

18  controlled by . . . a refiner").  Thus, in *Merlino*, the Second Circuit affirmed the district court's

19  dismissal of a PMPA action against Getty, a distributor that bought gasoline already refined on the

20  open market, and that owned and controlled its own trademark.  *Merlino*, 916 F.2d at 53–54 ("We

21  see no indication that Congress intended to reach non-integrated entities such as non-refiner-

22

23      [10] This is likely due to the fact that this argument was presented for the first time at oral
24  argument.  As a result, the Court has scant information on the operations of Golden West, whether it
   is an active refinery, and what its present relationship is to Thrifty.  Indeed, prior to oral argument,
   the Franchisees had not even contested whether Thrifty is a refiner under the PMPA, save a single
25  statement that "Thrifty Oil Company is arguing that it really isn't an oil company." (Reply to Thrifty
   2, 665 ECF No. 26)  What's in a name?  Certainly not facts sufficient to establish that Thrifty is a
26  "refiner" under the PMPA.

27      [11] Thrifty correctly points out that to the extent this argument has any merit, it would apply
   solely to the Thrifty-branded service stations, and not the ARCO-branded stations.  Because the Court
28  ultimately concludes that the licensing of its trademark alone does not bring Thrifty within the
   parameters of the PMPA, it need not parse out which Franchisees may rely on this argument.

1  distributors who control their own trademarks.").

2          Similarly, here, the Court declines to extend the PMPA to reach a non-refiner, non-

3  distributor (Thrifty) that licenses its trademark to a refiner (BPWCP) that subsequently sublicenses

4  the trademark to retailers (the Franchisees).  Indeed, the instant situation is even more removed

5  from the PMPA than the situation in *Merlino*.  In *Merlino*, the party contracting with retailers to

6  license its trademark (Getty) was a distributor, but was held not to be subject to the PMPA because

7  it was not a refiner.  Here, Thrifty is neither a refiner nor a distributor, and as discussed *infra*, has

8  no direct contractual relationship with the retailers.

9  *(2) No Contractual Relationship Between Thrifty and Franchisees*

10         "It is clear that under the PMPA a franchise is viewed as a direct contractual relationship."

11 *Hutchens v. Eli Roberts Oil Co.*, 838 F.2d 1138, 1144 (11th Cir. 1988) (citing 15 U.S.C.

12 § 2801(1)[12]); *see also Brown v. Am. Petrofina Marketing, Inc.*, 555 F. Supp. 1327, 1332 (M.D. Fla.

13 1983) ("[I]n order for plaintiffs to be afforded the protections given to franchisees under the

14 PMPA, there must be a franchise.  In order for a franchise to exist, there must be a

15 contract—either written or oral—between the parties which pertains to the sale or distribution of

16 motor fuel." (citing *Bsales v.Texaco, Inc.*, 516 F. Supp. 655, 661 (D.N.J. 1981))).

17
_____

18         [12] Section 2801(1) provides:

19         (A) The term "franchise" means *any contract*—
                    (i) between a refiner and a distributor,
20                  (ii) between a refiner and a retailer,
                    (iii) between a distributor and another distributor, or
21                  (iv) between a distributor and a retailer,

22         under which a refiner or distributor (as the case may be) authorizes or permits a
           retailer or distributor to use, in connection with the sale, consignment, or distribution
23         of motor fuel, a trademark which is owned or controlled by such refiner or by a
           refiner which supplies motor fuel to the distributor which authorizes or permits such
24         use.

25         (B) The term "franchise" includes—
                    (i) *any contract* under which a retailer or distributor (as the case may be) is
26                  authorized or permitted to occupy leased marketing premises . . . .
                    (ii) *any contract* pertaining to the supply of motor fuel . . . .
27                  (iii) the unexpired portion of any franchise, as defined by the preceding
                    provisions of this paragraph . . . .
28
    (emphasis added).

                                              - 9 -                                    12cv665

1        Here, the Franchisees have not alleged the existence of any contract between them and

2   Thrifty.  The only contractual relationship that Thrifty is a party to is that between Thrifty and

3   BPWCP, pursuant to which BPWCP is granted the authority to sublease the land it leases from

4   Thrifty to the Franchisees, and to sublicense Thrifty's trademark to some of the Franchisees.  This

5   does not establish a franchise relationship between the Franchisees and Thrifty, however.  *Denise*

6   *Petroleum*, 32 F. Supp. 2d at 538 ("[A]lthough Congress broadly defined 'contract,' it did not

7   intend that a retailer . . . who is supplied by a distributor . . . could bring an action against a

8   refiner . . . with whom the retailer has no relationship except ultimately receiving its motor fuel

9   [and selling that fuel under the refiner's trademark]. . . . [T]he only contract that can be said to

10  have existed was between the plaintiffs and [the distributor] – not the plaintiffs and the [refiner and

11  trademark holder]."); *Rogue Valley Stations, Inc. v. Birk Oil Co., Inc.*, 568 F. Supp. 337, 344 (D.

12  Or. 1983); *Brown*, 555 F. Supp. at 1332.

13       The Franchisees presented several theories for why a direct contractual relationship

14  between Thrifty and the Franchisees should not be required, none of which the Court finds

15  convincing.  At the heart of all these arguments is the control Thrifty allegedly has over the

16  Franchisees' use of its trademark.  In essence, the Franchisees contend that Thrifty has the power

17  to terminate the Thrifty-branded Franchisees' use of the Thrifty trademark, and that this is

18  tantamount to terminating the franchise agreement.  The Court declines to expand the scope of the

19  PMPA as the Franchisees invite, however.

20       First, the Court doubts that Thrifty exercises any direct control over the Franchisees' use of

21  the trademark as the Franchisees suggest.  Although the parties have not provided a copy of the

22  BPWCP-Thrifty trademark license agreement at this stage, the Franchisees direct the Court to look

23  to the Tesoro-Thrifty trademark license agreement by analogy.  (Franchisee TRO ¶ 5, 665 ECF

24  No. 17)  Even assuming the BPWCP-Thrifty agreement is similar to the Tesoro-Thrifty agreement,

25  however, it is plain from a close reading of that agreement that it is Tesoro that has control over

26  the Franchisees' use of the Thrifty trademark, not Thrifty.  (Franchisee TRO Ex. 14, at 46–49, 665

27  ECF No. 17-14 (Tesoro-Thrifty Agreement))  Similarly, here the only control Thrifty has over the

28  Franchisees' use of its trademark is indirect—via Thrifty's control over BPWCP's use and

1    sublicense of the mark.

2         Second, even if Thrifty did have direct control over the Franchsiees' use of the Thrifty

3    trademark, the PMPA was designed to target the inequities that may result from the integration of

4    franchise-related services.  *Merlino*, 916 F.2d at 53.  But those inequities are not present here,

5    where Thrifty played no role in the supply of motor fuel to the Franchisees, and indeed had no

6    direct relationship with the Franchisees whatsoever.  The Court therefore finds that the absence of

7    a direct contractual relationship between the Franchisees and Thrifty is dispositive.  Thus, for this

8    reason as well, the Court concludes that Thrifty is not subject to the PMPA in these actions.

9    ***B. An Injunction Cannot Be Issued Because it Would Improperly Enjoin Thrifty***

10        In order for the Court to enjoin BPWCP's termination of the franchises, it would be

11   necessary also to enjoin Thrifty, who—as the Court has already decided—is not a proper party to

12   this PMPA action.  Specifically, an injunction prohibiting the termination of the franchises would

13   require Thrifty—who has already entered into lease agreements for the same underlying properties

14   with a non-party, Tesoro—to renew BPWCP's lease agreements, even though BPWCP declined to

15   exercise its renewal option over a year and a half ago.  Because of this, both BPWCP and Thrifty

16   contend that an injunction in these circumstances is beyond the Court's power.

17        The Court is indeed wary of the domino effect an injunction against BPWCP might have,

18   and is cognizant of the restraint the Court should use in exercising its equity jurisdiction.  *Alemite*

19   *Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L. Hand, J.) ("[A] court of equity . . . cannot

20   lawfully enjoin the world at large . . . .").  As noted, the "three-party chain of

21   authorization"—refiner to distributor to retailer, with no direct contractual relationship between

22   the refiner and the retailer—is the usual structure of franchise relationships under the PMPA.

23   *Lasko*, 547 F. Supp. at 219.  Thus, it would seem that the situation might frequently arise that an

24   injunction a retailer seeks against the distributor could also impact the refiner.  Unfortunately,

25   however, there seems to be a dearth of authority interpreting the PMPA's equitable enforcement

26   provisions in circumstances such as these.

27        BPWCP and Thrifty primarily rely on one unpublished 1979 decision from the Eastern

28   District of New York in support of their argument that an injunction may not be issued.  *Sachi v.*

1    *Mobil Oil Corp.*, No. 79-C-2345, 1979 U.S. Dist. LEXIS 8463 (E.D.N.Y. Nov. 20, 1979).  There,

2    the district court denied the plaintiff franchisee's motion for a preliminary injunction against

3    franchisor Mobil:

4           In order for this court to enjoin Mobil's termination of plaintiff's franchise, we
            would have to order . . . the fee owner of the demised premises[] to renew the
5           underlying lease even though Mobil failed to properly execute its renewal option.
            [The fee owner] is not a party to the instant action.  Indeed, we do not believe that
6           she could properly have been made a party since the rights conferred and
            obligations imposed by the Act do not appear to extend to an individual in her
7           position.  And, of course, it is established beyond predefined that a court's equity
            power extends only to parties who are before the court. . . .  The matter is further
8           complicated by the fact that the fee owner has already contracted to sell the
            premises to yet a fourth party, who like the fee owner, is not before the court.
9           The present situation is thus closely analogous to a case where a party brings an
            action seeking specific performance of a contract to convey real property where
10          the defendant has already conveyed the property to a third party who took title
            without notice of plaintiff's claim.  In such a case the court cannot exercise its
11          equity jurisdiction. . . .  In the action before us the court is without power to
            compel a continuation of the full contractual relationship between the parties.  If
12          the defendant has violated plaintiff's rights under the Act, plaintiff must seek
            redress in damages.

13
     *Id.* at *13–14 (citations omitted).  BPWCP and Thrifty suggest that in the factually similar
14
     circumstances before the Court today, an injunction cannot be issued because it would improperly
15
     enjoin Thrifty.
16
            Notwithstanding this legitimate concern, the Ninth Circuit has stressed that "Section
17
     2805(b)(2) of the PMPA makes the grant of a preliminary injunction *mandatory*" if the there are
18
     serious questions going to the merits and the balance of hardships tips in the franchisee's favor.
19
     *Hilo*, 997 F.2d at 643.  Indeed, the "standard for preliminary injunctions was intentionally drawn
20
     to facilitate the grant of injunctive relief."  *Barnes v. Gulf Oil Corp.*, 824 F.2d 300, 306 (4th Cir.
21
     1987) (discussing the balance of hardships).  Thus, just as the test for a preliminary injunction
22
     under the PMPA is more liberal than under Federal Rule of Civil Procedure 65, *Khorenian*, 761
23
     F.2d at 535, so too might the general rule precluding orders against nonparties be relaxed in the
24
     context of the PMPA.
25
            Upon consideration, however, the Court believes that an injunction would be improper.
26
     Enjoining BPWCP from terminating or not renewing the franchises is only possible if BPWCP can
27
     extend the underlying leases on the service station properties.  But BPWCP's option to renew
28

                                              - 12 -                                        12cv665

1  those leases has already expired, and the leases are set to expire on a rolling basis beginning on

2  April 23, 2012.  And because Thrifty is not a proper party to this action under the PMPA, the

3  Court is powerless to compel Thrifty not only to renew its leases with BPWCP, but also to back

4  out of its lease agreements with Tesoro.

5        By analogy, it may be helpful to look to another statute that contains its own special

6  injunctive relief provision instead of requiring parties to resort to Rule 65 for such preliminary

7  relief.  One such statute is the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18

8  U.S.C. § 1963(d)(1)(A), which authorizes restraining orders or injunctions "to preserve the

9  availability of property" subject to forfeiture to the United States.  That provision has been

10 interpreted to allow a court to enjoin innocent third parties where necessary to give effect to the

11 purpose of the statute—namely, to preserve the property—despite the general rule that a court may

12 not issue an order against a nonparty.  *United States v. Regan*, 858 F.2d 115, 120 (2d Cir. 1988).

13 The Second Circuit reached that conclusion by distinguishing between § 1963(d)(1)(A) and

14        the typical injunction designed to affect the conduct of a party based upon a
         determination of that party's legal rights.  In the case of the latter, the party is
15       normally restrained from acting in a way determined to be illegal in the court of
         the litigation or ordered to take steps to remedy acts determined to be illegal,
16       again in the course of the litigation.  A restraining order under Section
         1963(d)(1)(A), by contrast, is designed only to preserve property for forfeiture
17       after a RICO conviction.  Section 1963(d)(1)(A) orders thus resemble remedies
         such as garnishment or attachment that may be directed routinely at third
18       parties . . . .
   *Id.*
19

20       The PMPA is unlike the RICO Act, however.  In the RICO Act context, the purpose of the

21 Act's restraining order provision—preservation of property—might be frustrated if there were a

22 "wholesale bar to restraints on third parties."  *Regan*, 858 F.2d at 120.  Conversely, the purpose of

23 the equitable relief provision of the PMPA is aligned with that set forth in Federal Rule of Civil

24 Procedure 65, notwithstanding the fact that the PMPA's is a more lenient standard.  As such, the

25 Court holds that the general requirement of Rule 65—that injunctions and restraining orders are

26 binding only on parties, parties' officers, agents, servants, employees, and attorneys, and persons

27 in concert or participation with those parties—should apply as well in the context of the PMPA.

28 Fed. R. Civ. P. 65(d)(2).  Accordingly, an injunction prohibiting BPWCP from termination or

nonrenewing the franchises cannot be issued in these circumstances.

1 *C.  An Injunction Against Thrifty is Not Warranted Under Rule 65*

2       Anticipating the Court's holding on this issue, Crossroad alternatively requests that the

3 Court enjoin Thrifty from turning over the properties to Tesoro pursuant to Federal Rule of Civil

4 Procedure 65.  (Crossroad TRO 15–18, 665 ECF No. 31)  The rationale apparently being that if

5 Thrifty could be separately enjoined under Rule 65, then the concerns regarding the repercussions

6 of enjoining BPWCP would be alleviated.  Crossroad's Rule 65 TRO request against Thrifty arises

7 out of the allegation that as recently as March 12, 2012, Crossroad engaged in discussions with

8 Thrifty representatives regarding leasing franchises directly from Thrifty, and was "led to believe

9 that it would be offered leases for its current premises and/or leases for additional or different

10 stations."  (*Id.* at 16)

11       Unlike the PMPA's standard for injunctive relief, Rule 65 requires Crossroad to establish

12 that it is likely to suffer irreparable harm in the absence of preliminary relief, and further requires

13 there to be a likelihood of success on the merits, rather than merely serious questions going to the

14 merits.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Sierra Forest*

15 *Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).  Here, Crossroad has met neither of these

16 requirements.  Crossroad's allegations support an inference only that Thrifty engaged in

17 negotiations with Crossroad—negotiations that Crossroad hoped would be consummated by a

18 direct agreement between Thrifty and Crossroad, but that ultimately were not.  This is not enough

19 to establish a likelihood of success on the non-PMPA claims asserted against Thrifty.[13]

20       Regarding irreparable harm, the Court does not doubt that Crossroad—and all the

21 Franchsiees—may suffer significant financial hardship by the loss of their franchises.  Many of the

22 Franchisees have invested substantial resources into their service stations, and the stations are a

23 primary source of income for many of these individuals and their families.  The Court is

24 sympathetic to these losses, but they are nevertheless reparable by money damages.  *Rent-A-*

25 *Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)

26 ("[E]conomic injury alone does not support a finding of irreparable harm, because such injury can

27

28     [13] The remainder of Crossroad's allegations against Thrifty are premised on there being a franchise relationship between Crossroad and Thrifty, which the Court has already determined is not so.

12cv665

1   be remedied by a damage award.").

2         To the extent that Crossroad asserts that its harm is irreparable because it will also lose the

3   substantial goodwill it has built up during the ten years its stations have operated, this assertion is

4   undermined by its allegation that its delay in seeking an injunction was due to its "anticipation that

5   it would remain at its current premises *or be offered additional and/or different stations*."

6   (Crossroad TRO 16, 665 ECF No. 31 (emphasis added))  Any goodwill Crossroad has garnered

7   would be tethered to the specific stations it operates.  The fact that Crossroad was willing to forego

8   an injunction prohibiting the closure of its existing stations in exchange for the opportunity to

9   operate different stations suggests a lack of concern about the loss of its goodwill, or at the very

10  least that this loss would be reparable.

11  **2. Injunction Against Placing the Franchisees on Cash on Delivery**[14]

12        Effective fourteen days before the nonrenewal/termination date for each of the franchises,

13  BPWCP has placed or will place the Franchisees on COD.  (*See, e.g.*, TRO Ex. 1, 887 ECF No. 24

14  ("[I]n preparation of the nonrenewal/termination of the Existing Franchise Agreements, you will

15  be required to make payment by cashier's check for any and all deliveries of fuel commencing on

16  April 11, 2012."))  BPWCP represents that it is its standard practice to place outgoing franchises

17  on COD thirty days prior to the end of the franchise, and further that the franchise agreements

18  between BPWCP and each of the Franchisees provides that payment for gasoline deliveries may

19  be COD:

20        **Payment.**  Unless BPWCP Extends credit to Franchisee as provided below,
          Franchisee will pay for ARCO branded Motor Fuels prior to its delivery in U.S.
21        dollars.  BPWCP shall require a product advance payment approximately equal to
          the current cost of an average delivery of Branded Motor Fuel.  BPWCP may
22        increase or decrease the amount of the advance payment at any time to reflect
          current prices and Franchisee will pay any additional amount necessary if the
23        advance payment is increased.  Payment will be made by U.S. Postal money
          order, other money order approved by BPWCP, electronic funds transfer initiated
24        by BPWCP, wire transfer, cashier's check or business check, whichever BPWCP
          directs, delivered by Franchisee at the time and place as designated by BPWCP.
25        BPWCP's direction as to method of payment may change from time to time at

26   _____

27   [14] In this Court's Order directing a response and reply to the Franchisees' motion for a TRO
     filed in the related case, the Court directed the Franchisees to address in their reply, *inter alia*,
     "whether the Franchisees are seeking to enjoin BPWCP from placing the Franchisees on cash on
28   delivery."  (Order, Apr. 11, 2012, at 2, 887 ECF No. 31)  The reply does not address the COD issue
     whatsoever, though the Franchisees emphasized the need for such an injunction at oral argument.

1

2

    BPWCP's sole discretion. . . .

    . . .

3

4

5

6

7

8

9

    **Credit.**  BPWCP may in its sole discretion from time to time extend credit to Franchisee in whatever amounts and on whatever terms BPWCP alone suggests. If BPWCP extends Franchisee credit, BPWCP may withdraw it at any time without notice and for any reason.  If BPWCP extends credit to Franchisee and Franchisee fails to comply with any of the credit terms or, if in BPWCP's sole judgment, Franchisee is or becomes financially unsound, BPWCP may do any or all of the following: (i) require that Franchisee pay for ARCO Branded Motor Fuels by cashier's check, money order or bank wire transfer prior to delivery, (ii) require that Franchisee post an irrevocable letter of credit issued by a bank satisfactory to BPWCP, (iii) require Franchisee present evidence of financial solvency, and (iv) declare Franchisee in default of this Agreement if Franchisee fails to pay any indebtedness when due, provide evidence of financial solvency upon request or comply with any other term of this Agreement.  Franchisee agrees that regardless of whether and for how long BPWCP has extended it credit, BPWCP may cease extending credit at any time.

10

(Decl. of Julie A. Jackson ("Jackson Decl.") Ex. A, 887 ECF No. 32-2)

11

12

       The PMPA "prohibits only that franchisor conduct that has the effect of ending a

13

franchise." *Mac's Shell Serv. v. Shell Oil Prods. Co. LLC*, 130 S. Ct. 1251, 1257 (2010).  To that

14

end, "[t]he PMPA is not concerned with 'other contractual arrangements which may exist between

15

a franchisor and a franchisee, *e.g.*, credit card arrangements, contracts related to financing of

16

equipment, or contracts for purchase and sale of tires, batteries, or automotive accessories.'"

17

*Shukla v. BP Exploration & Oil*, 115 F.3d 849, 854 (11th Cir. 1997) (quoting S. Rep. No. 95-731,

18

at 29, *reprinted in* 1978 U.S.C.C.A.N. 873, 888).  Nevertheless, "[t]he substantive provisions of

19

the [PMPA], relating to the termination of a franchise or non-renewal of the franchise relationship,

20

may not be circumvented by a termination or non-renewal of the real estate lease or motor fuel

21

supply agreement which thereby renders the trademark license valueless."  S. Rep. No. 95-731, at

22

29, *reprinted in* 1978 U.S.C.C.A.N. 873, 888; *see also Smith v. Atlantic Richfield Co.*, 533 F.

23

Supp. 264, 268 (E.D. Pa. 1982) ("The legislative history [of the PMPA] indicates merely that the

24

PMPA may not be circumvented by terminating secondary arrangements essential to the operation

25

of the motor fuel franchise.  It does not indicate that all secondary arrangements are covered.  The

26

critical question is whether the [secondary arrangement at issue] is essential to plaintiff's motor

27

fuel franchise.").

28

       Without resolving the question whether the PMPA embraces claims for constructive

termination, the Supreme Court recently determined that even if it does, "a franchisee cannot

1  recover for constructive termination under the PMPA if the franchisor's allegedly wrongful

2  conduct did not compel the franchisee to abandon its franchise." *Mac's Shell Serv.*, 130 S. Ct. at

3  1255.[15]  The Franchisees now contend that the COD scheme does exactly that: COD apparently is

4  the "death knell" of the franchise.  The Court pressed for more information at the hearing, but the

5  Franchisees were unable to confirm whether a single Franchisee has had to shut its doors in

6  advance of its termination date as a result of being placed on COD.  This despite the fact that

7  several Franchisees have allegedly been placed on COD since at least April 10, 2012.  (TRO Ex. 1,

8  887 ECF No. 24); (BPWCP Chart 16–18, 887 ECF No. 47)  With regard to Crossroad in

9  particular, though Crossroad alleged that it "will not be able to operate its stations by COD

10  Cashier's Check," (Crossroad TRO 16, 665 ECF No. 31), at least three of its stations were placed

11  on COD as of April 10 and April 11, (BPWCP Chart 16–17, 887 ECF No. 47), and Crossroad did

12  not represent at oral argument on April 17 that any of those three stations had terminated its

13  operations.

14      In addition, it appears that the terms of the franchise agreements explicitly allow for

15  BPWCP to place the outgoing Franchisees on COD.  *See Jackson v. Kerr-McGee Refining Corp.*,

16  1989 U.S. Dist. LEXIS 15266, at *10 (D. Ark. 1989) ("The requirement that cash on delivery be

17  paid violated no contractual provision between the parties and violated no statutory provisions

18  within the PMPA.").  Accordingly, the Court finds that an injunction prohibiting BPWCP from

19  placing any additional outgoing Franchisees on COD is not warranted.

20  //

21

22      [15] The Supreme Court went on to state that

23      [A]llowing franchisees to obtain PMPA relief for conduct that does not force an end
        to a franchise would extend the reach of the Act much further than its text and
24      structure suggest.  Prior to 1978, the regulation of petroleum franchise agreements
        was largely a matter of state law. . . .  In enacting the PMPA, Congress did not
25      regulate every aspect of the petroleum franchise relationship but instead federalized
        only the two parts of that relationship with which it was most concerned: the
26      circumstances in which franchisors may terminate a franchise or decline to renew a
        franchise relationship. . . .  Congress left undisturbed state-law regulation of other
27      types of disputes between petroleum franchisors and franchisees.  *See* § 2806(a) (pre-
        empting only those state laws governing franchise terminations and nonrenewals).
28

*Mac's Shell Serv.*, 130 S. Ct. at 1259.

1

**CONCLUSION**

2    For the reasons stated above, the Court finds that an injunction is improper under the

3 factual circumstances present in these actions.  The three motions are accordingly **DENIED**.

4    As discussed at the hearing, the Court directs the parties to jointly move to consolidate the

5 lead case with the related case, and to file an amended, restated pleading within <u>twenty-one days</u>

6 of the date this Order is electronically docketed.  All future docketing shall be done in the lead

7 case, *BP West Coast Products, LLC v. Crossroad Petroleum, Inc.*, 12cv665 JLS (KSC).

8    **IT IS SO ORDERED**.

9

10 DATED:  April 19, 2012

11                   Honorable Janis L. Sammartino
                     United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

               12cv665