1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BP WEST COAST PRODUCTS, LLC,<br>          Plaintiff and Counter-Defendant,<br>                    v.<br>CROSSROAD PETROLEUM, INC., ET AL.,<br>          Defendants and Counter-Claimants.<br>AND RELATED CONSOLIDATED ACTIONS | Case No.:  12cv665 JLS (JLB) (Lead Case)<br><br>**ORDER (1) GRANTING BP'S PMPA MOTION FOR SUMMARY JUDGMENT; (2) DENYING BP'S INDEMNITY MOTION FOR SUMMARY JUDGMENT; (3) DENYING AS MOOT BP'S MOTION FOR SUMMARY JUDGMENT AGAINST PACIFIC EXPOTECH; (4) DENYING BP'S MOTION TO STRIKE UNTIMELY FILINGS; AND (5) DENYING AS MOOT BP'S MOTION TO STRIKE SCHILLER DEFENDANTS' OPPOSITIONS**<br><br>(ECF Nos. 492, 493, 494, 518, & 519) |

Presently before the Court are three motions for summary judgment filed by plaintiff and counter-defendant BP West Coast Products (BP): BP's Motion for Partial Summary Judgment on the PMPA Claims (PMPA MSJ), (ECF No. 492-2); BP's Motion for Partial Summary Judgment Re Indemnity Obligations (Indemnity MSJ), (ECF No. 493-2); and

/ / /

1

BP's Motion for Summary Judgment Against Pacific Expotech and Its Guarantors (Expotech MSJ), (ECF No. 494-1).

In its Expotech MSJ, BP seeks summary judgment against defendant and counter-claimant Pacific Expotech and its Guarantors. These Defendants/Counter-Plaintiffs[1] reached a settlement agreement with BP at a June 8, 2016 Mandatory Settlement Conference with Magistrate Judge Jill L. Burkhardt. (*See* ECF No. 530.) Accordingly, the Court **DENIES AS MOOT** BP's Expotech MSJ.

Although several other Defendants have reached settlement agreements with BP, BP initially directed its PMPA MSJ against 53 Defendants[2] and its Indemnity MSJ against two groups of Defendants: 53 against whom it seeks to enforce franchise indemnity agreements and 79 against whom it seeks to enforce guaranty agreements.[3]

---

[1] The Court refers to the Defendants and Counter-Plaintiffs in this matter generally as "Defendants" for simplicity.

[2] For purposes of these Motions, the Defendants, operate in three groups: the "Meetra Defendants," who are Meetra, Inc. (Meetra), Medhi Behmard, and Farideh Behmard; the "Schiller Defendants," who are the 116 Defendants represented by attorney David Schiller; and the "Crossroad Defendants," who are Crossroad Petroleum, Inc. (Crossroad) and Ahd Haddad. The PMPA MSJ seeks partial summary judgment against the following Defendants who have not settled:

- Meetra Defendants: Meetra;
- Schiller Defendants: 2 United Oil, LLC; Sharina Alloush; Khaja Ansari; Salman D. Barbat; Big Daddy's Oil 14, Inc.; Denise M. Brown; Cal Coast, Inc.; California Fuel Dispensing, Inc.; Rafael Castillo/ Basel Hassounch; Chase Products, Inc.; Daisie Enterprises, Inc.; Issa T. Demes; Dream Petroleum, Inc.; Ghallab Brothers, Inc.; H&O, Inc.; Hadaf, Inc.; HRMP Corp.; Kulwant Singh Jafal; K&T Park 79, Inc.; Parshotam Kamboj; MDA Fuel, Inc.; Monteagudo Enterprises, Inc.; Gagan Natt; NP Petroleum Corp.; NRRM Corp.; PB, Inc.; Perfect Fuel, Inc.; Rasna, LLC; RP Oil, Inc.; Ruchisys, Inc.; Susan Shen Chin; Shomers Group, LLC; SMO Oil, Inc.; South West Petroleum, LLC; Taftan, Inc.; Brittany Torres; Vasaya Oil Co., Inc.; West Coast Petroleum Services; Toros Zorenkelian; and
- Crossroad Defendants: Crossroad.

The PMPA MSJ was originally directed toward the following Defendants who have now settled: 3 Interstellar Management, Inc.; Awans Enterprises, Inc.; Battir Oil, Inc.; Big Daddy's Oil 15, Inc.; Crestview Consolidated, Inc.; MK Oil Inc./Kaskas Enterprises Inc.; Hamlet Enterprises, Inc.; Rahgozar, Inc.; Shamaah, Inc.; Southland Petroleum, Inc.; Westminster Mini Market, Inc.; United Family, LLC. (*See* ECF No. 534.)

[3] The Indemnity MSJ seeks partial summary judgment against the following Defendants who have not settled:

1    Three opposition briefs were filed in response to BP's PMPA MSJ: Meetra's

2    Opposition, (Meetra PMPA Opp'n, ECF No. 504); the Schiller Defendants' Opposition,[4]

3    (Schiller Opp'n, ECF Nos. 506 & 507); and Crossroad's Opposition, (Crossroad PMPA

4    Opp'n, ECF No. 509).  BP filed a single reply in support of its PMPA MSJ.  (PMPA Reply,

5    ECF No. 515.)

6    / / /

7

8

9    • Meetra Defendants: (for indemnity) Meetra, (for guaranties) Farideh Behmard; Medhi Behmard;

     • Schiller Defendants: (for indemnity) 2 United Oil, LLC; Sharina Alloush; Khaja Ansari; Salman D.
10      Barbat; Big Daddy's Oil 14, Inc.; Denise M. Brown; Cal Coast, Inc.; California Fuel Dispensing, Inc.;
        Rafael Castillo/ Basel Hassounch; Chase Products, Inc.; Daisie Enterprises, Inc.; Issa T. Demes;
11      Dream Petroleum, Inc.; Ghallab Brothers, Inc.; H&O, Inc.; Hadaf, Inc.; HRMP Corp.; Kulwant Singh
        Jafal; K&T Park 79, Inc.; Parshotam Kamboj; MDA Fuel, Inc.; Monteagudo Enterprises, Inc.; Gagan
12      Natt; NP Petroleum Corp.; NRRM Corp.; PB, Inc.; Perfect Fuel, Inc.; Rasna, LLC; RP Oil, Inc.;
        Ruchisys, Inc.; Susan Shen Chin; Shomers Group, LLC; SMO Oil, Inc.; South West Petroleum, LLC;
13      Taftan, Inc.; Brittany Torres; Vasaya Oil Co., Inc.; West Coast Petroleum Services; Toros
        Zorenkelian; (for guaranties) Sharina Alloush; Habib Alam; Manal Alam; Natalie Alvandi; Fazilath
14      Ansari; Khaja Ansari; Rajesh Arora; Heidi Bahmani; Mohammad Bahmani; Bahman Baktar; Nesrin
        Barbat; Salman D. Barbat; Paul Baskaron; Younes Dobli Bennani; Rafael Castillo; Issa T. Demes;
15      Ibrahim Ghallab; Maret Golnazarian; Razmik Golnazarian; Basel Hassounch; Kulwant Singh Jafal;
        Rafwant Jafal; Parshotam Kamboj; Omer Kassa; Bahman Kianmahd; Behzad Kianmahd; Sahar
16      Kirmiz; William Kirmiz; Kalur Kishan; Tarun Maitra; Ani P.K. Mirzaian; Liliana Monteagudo; Senan
        Naoum; Anit Natt; Gagan Natt; David Parker; Anup Patel; Soma Prasad; Nader Sahih; Payam Sahih;
17      Himanshu Sarvaiya; Sonal Shah; Yogesh Shah; Aly Shakankiry; Ruchira Sharma; Susan Sen Chin;
        Hamza Shilleh; Vache Simonyan; Kevin Tapia; Tracy Tapia; Seyed Majid Tavabi; Brittany Torres;
18      Jerry Zomorodian; Rebecca Zomorodian; Marie Zorenkelian; Toros Zorenkelian; and

19   • Crossroad Defendants: (for indemnity) Crossroad; (for guaranties) Ahd Haddad.

20   The Indemnity MSJ was originally directed toward the following parties who have now settled: (for
     guaranties) 3 Interstellar Management, Inc.; Awans Enterprises, Inc.; Battir Oil Inc.; Big Daddy's Oil 15,
21   Inc.; Crestview Consolidated, Inc.; MK Oil Inc./Kaskas Enterprises Inc.; Hamlet Enterprises, Inc.;
     Rahgozar, Inc.; Shamaah, Inc.; Southland Petroleum, Inc.; Westminster Mini Market, Inc.; United Family,
22   LLC; (for guaranties) Anita Alvandi; Francois Alvandi; Robert Alvandi; Sylvia Haddadin; Mohammad
     Kaskas; Tahssen Kaskas; Abraham Kurian; Ammar Maaytah; Randa Maaytah; Salah Mazloum; Tigran
23   Pogosyan; Muna Quasqas; Mostafa Rahgozar; Hy E. Sao; Meng E. Sao; Claude Shamaah; Sheela Thomas;
     Kotsai Wang; Ara Wansikehian.  (*See* ECF No. 534.)
24

25   [4] The Schiller Defendants filed two opposition briefs, one short and one long, although it is not clear why.
     The briefs were filed in response to both the PMPA MSJ and the Indemnity MSJ, although they only
26   attempt to respond to the PMPA arguments.  For lack of better options, the Court construes these
     opposition briefs as a single long opposition for purposes of each MSJ, and deem these papers to be the
27   operative opposition brief for each group of Schiller Defendants, depending on which MSJ the Court is
     analyzing.
28

3

Likewise, three opposition briefs were filed in response to BP's Indemnity MSJ: the Meetra Defendants' Opposition, (Meetra Indemn. Opp'n, ECF No. 505); the Schiller Defendants' Opposition, (Schiller Opp'n, ECF Nos. 506 & 507); and the Crossroad Defendants' Opposition, (Crossroad Indemn. Opp'n, ECF No. 510).  In support of its Indemnity MSJ, BP filed three reply briefs, one responding to each opposition brief. (Indemn. Reply to Schiller, ECF No. 521; Indemn. Reply to Crossroad, ECF No. 522; Indemn. Reply to Meetra, ECF No. 523.)

The briefing on these MSJs elicited yet another round of motions and briefing.  In response to the Schiller Defendants' briefing, BP filed a Motion to Strike Evidentiary Objections to Schiller Defendants' Responses to BPWCP's Motions for Summary Judgment (Motion to Strike Schiller Oppositions), (ECF No. 518-1), and in response to the Crossroad Defendants' late-filed oppositions, BP filed a Motion to Strike Crossroad Petroleum, Inc.'s Untimely Responses to BPWCP's Motions for Summary Judgment (Motion to Strike as Untimely), (ECF No. 519-1).  The Crossroad Defendants filed an opposition to, (Strike Opp'n, ECF No. 528), BP's Motion to Strike as Untimely.  The Court **DENIES** BP's Motion to Strike as Untimely.[5]

For the reasons stated below, the Court **GRANTS** BP's PMPA MSJ, **DENIES** BP's Indemnity MSJ, and **DENIES AS MOOT** BP's Motion to Strike Schiller Oppositions.

## BACKGROUND

The Defendants operated gas stations under franchise agreements with BP on sites they leased from BP, and the guarantor Defendants backed these lease and franchise agreements.  BP did not own the land, but leased the more than 200 gas station sites relevant to this litigation as a package deal from Thrifty Oil Co. (Thrifty).

/ / /

/ / /

/ / /

---

[5] The Crossroad Defendants' counsel accidentally filed one day late and these matters are better resolved on the merits.

4

Thrifty leased the land to BP under the Agreement to Lease Retail Gasoline Facilities (Master Agreement).  (Statement of Facts, ¶¶ 1–2, ECF No. 493-3 [*hereinafter* "Indemnity SOF"]; Wolfe Decl., Ex. A ¶ 4.)  The deal involved more than 200 gas station sites in California.  BP and Thrifty executed individual lease agreements for each site, referred to as "Master Leases," each of which incorporated the Master Agreement by reference.  (Indemn. SOF ¶ 2.)  By organizing hundreds of gas stations under the Master Agreement, Thrifty achieves "(i) benefits of economies of scale, (ii) ease of management, and (iii) efficiency of enforcement of master lessee obligations and direct recourse to remedy any damages suffered by the master lessor."  (Statement of Facts ¶ 5, ECF No. 492-3 [*hereinafter* "PMPA SOF"] (citing Esses Report, Risner Decl. Ex. 139, ECF No. 492-178).)

The Master Leases were set to begin expiring in 2012, but gave BP an option to extend (Extension Options).  (PMPA SOF ¶¶ 1–8, 14.)  However, BP had to exercise the Extension Options well in advance, by July 1, 2010, or else they would expire.  (PMPA SOF ¶ 14.)  The Extension Options terms provided, "In order to exercise an Extension Option under any Lease, [BP] must exercise the corresponding Extension Options of all Leases, except those Leases which by their provisions have terminated prior to the date of exercise."  (PMPA SOF ¶ 14.)

Before entering the franchise agreements, each of the Defendants subject to the PMPA MSJ acknowledged that the premises they leased were subject to the Master Lease, (PMPA SOF ¶ 12 (citing Risner Decl. Exs. 1–52, 127, 128, 131, 132, ECF Nos. 492-6– 492-82, 492-157–492-163, 492-166–492-171)), although they were not actually provided a copy of the contract between BP and Thrifty.  The acknowledgements stated, for example:

1. The premises are leased to BP West Coast Products LLC by a third party pursuant to a lease agreement ("Master Lease").

2. The Master Lease expires by its express terms on [Applicable Expiration Date], with an early out date of [if applicable] and may be terminated prior to its expiration date.

5

3. The lease pertaining to the premises between the Current franchisee and BP West Coast Products LLC is, in accordance with Section 2 thereof, subject to the terms and conditions of the Master Lease.  The lease may be terminated before the above dates if legal grounds exist to do so.

(PMPA MSJ ¶ 5; *see also, e.g.*, Risner Decl., Ex. 1, ECF No. 492-6, at 44.)[6]

In May 2010, BP notified Thrifty that it would not exercise the Extension Options. (PMPA SOF ¶ 15.)  BP had not completely abandoned the leased gas stations, however, and attempted to negotiate a new contract with Thrifty.  (*See* PMPA SOF ¶ 17.)  These negotiations did not lead to a deal and, in September 2011, BP learned that Thrifty had agreed to lease these gas stations to Tesoro Refining & Marketing Company (Tesoro). (PMPA SOF ¶ 18.)  Soon after learning about the Tesoro deal, BP began sending the franchisees "Notices of Nonrenewal/Termination of the Franchise Agreements" (Notices). (PMPA SOF ¶ 19 (citing Risner Decl. Exs. 1–52, 127, 128, 131, 132, ECF Nos. 492-6–492-82, 492-157–492-163, 492-166–492-171).)  These Notices informed the franchisees of the date upon which BP would lose the right to grant them possession of the sites, and consequently, when they would have to relinquish control of their gas station premises. (*See* PMPA SOF ¶ 20.)  These Notices were sent at least ninety days before each termination or nonrenewal took effect.  (PMPA SOF ¶ 22.)  In February and March 2012, BP sent the franchisees additional Notices with "amended termination/nonrenewal dates." (PMPA SOF ¶ 21.)

Soon before the underlying Master Leases were due to expire, BP learned that many of the franchisees were preparing to refuse to leave the gas station properties or to sue BP. (Indemn. SOF ¶ 14.)  BP preemptively filed lawsuits in March 2012 seeking declaratory and injunctive relief affirming the propriety of the terminations and nonrenewals under the Petroleum Marketing Practices Act (PMPA) and to ensure the franchisees turned over the

/ / /

/ / /

---

[6] Pinpoint citations to docketed materials refer to the CM/ECF page number electronically stamped at the top of each page, and do not refer to the page numbering of the original document.

6

properties.  (Indemn. SOF ¶ 14.)  Several franchisees and guarantors filed their own lawsuits later that month, suing not only BP, but also Thrifty.  (Indemn. SOF ¶ 15.)  All of these actions were consolidated to this Court.

The franchisees and Thrifty had no contractual franchise relationship.  Although they operated gas stations on Thrifty's land, Thrifty leased the land to BP, and BP sub-leased the land to the franchisees.  The Defendants in April 2012 moved for a temporary restraining order and preliminary injunction against BP and Thrifty.  (ECF Nos. 17, 24, & 31.)  The Court denied these motions on April 19, 2012.  (ECF No. 43.)  BP and Thrifty all the while urged the Defendants to dismiss their claims against Thrifty.  (Indemn. SOF ¶¶ 19, 22, 23.)  The Defendants eventually relented, dismissing their claims against Thrifty in May 2012.  (ECF Nos. 71, 79.)

Both the Master Agreement and Master Leases obligated BP to indemnify Thrifty for any claims "related to the Gasoline Stations or any Lease Premises" and for Thrifty's "becoming a party to any action instituted by [BP] against any third party . .  or by any third party against [BP] . . . ."  (Indemn. SOF ¶¶ 3–4.)

The franchise agreements between BP and the franchisees required the franchisees, among other things, to maintain the leased premises and equipment in a particular manner, perform maintenance in some circumstances, return possession of the stations and leased equipment to BP at the expiration of the franchise agreements, and assign permits and licenses—such as licenses for alcohol, beer, and wine—to BP at the expiration of the lease.  (Indemn. SOF ¶ 6.)  The franchise agreements also included the following indemnity provision:

> Franchisee agrees to indemnify, hold harmless and defend BPWCP, its parents, subsidiaries, officers, directors and employees, from . . . any damages, claims, costs, expenses, fines or penalties relating to operation(s) . . . on the Premises, arising out of or in connection with any failure or breach by or on behalf of Franchisee respecting any provision of this Agreement, or arising out of Franchisee's use or occupancy of the Premises, Franchisee's operation of the business(es) or Franchisee's use, custody or operation of Loaned Equipment or any other equipment on the Premises . . . .

7

(Indemn. SOF ¶ 7.)  The guarantor Defendants executed Franchise Agreement Guaranties, backing the franchisee Defendants' obligations to BP.  (Indemn. SOF ¶ 8–9.)

Thrifty demanded that BP reimburse it for costs paid to defend this action, and BP ultimately paid $453,643.15.  (Indemn. SOF ¶¶ 25–29.)  BP attributes $449,060.50 of those costs to the Defendants who were originally subject to the Indemnity MSJ.  (Indemn. SOF ¶ 29.)  After the franchisees surrendered possession to BP, and BP in turn surrendered possession to Thrifty, Thrifty identified "defective conditions" at various facilities, including "(a) graffiti on the building structures, fixtures and equipment; (b) holes in building structures that needed repair; and (c) dispenser hoses.  Other defective conditions that applied to many of the Premises included those concerning costly landscaping and interior/exterior/canopy lighting issues."  (Indemn. SOF ¶¶ 33–38.)  Thrifty also demanded that BP compensate it for failing to timely turn over liquor licenses and for "holdover premiums" related to Meetra's five gas stations and one other site.  (Indemn. SOF ¶¶ 39, 40.)  After negotiating these matters for more than a year, BP and Thrifty settled these claims, with BP paying $2,120,881.10 for costs relevant here.  (Indemn. SOF ¶ 43.)  BP alleges that $1,908,668.21 of that is attributable to the Defendants subject to the Indemnity MSJ.  (Indemn. SOF ¶ 43.)

Meanwhile, in August 2012, BP announced the sale of its ARCO brand, which included 400 additional ARCO stations throughout Southern California, and nearly all of its Southern California assets, including a refinery located in Carson, California, to Tesoro, the entity who leased the premises after BP's Master Leases expired.  (PMPA SOF ¶ 23.) The BP-Tesoro deal closed on June 1, 2013.  (PMPA SOF ¶¶ 24, 26.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that may affect

8

the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact.  *Id.*  When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial.  *Celotex*, 477 U.S. at 324.  This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248.  The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

/ / /

/ / /

/ / /

/ / /

# ANALYSIS

## I.    The PMPA MSJ

In its PMPA MSJ, BP seeks summary judgment:

1.    On its First Claim for Relief under the Petroleum Marketing Practices Act (the PMPA), 15 U.S.C. § 2801 *et seq.*, in which BP seeks a declaratory judgment that it did not violate the PMPA, (BP Fifth Am. Compl. ¶¶ 137–140, ECF No. 296-3);

2.    Against Crossroad's counterclaims, in particular its First, Second, and Third Causes of Action, which allege that BP violated the PMPA, 15 U.S.C. § 2801, *et seq*., as set forth in Crossroad's Second Amended Counterclaim for Injunctive Relief and Damages, (Crossroad Second Am. Countercl. ¶¶ 35–72, ECF No. 206);

3.    Against Meetra's counterclaims, in particular its First and Second Causes of Action for violations of the PMPA and Declaratory Relief, respectively, (Meetra Inc.'s Third Am. Countercl. ¶¶ 40–49, ECF No. 263); and

4.    Against the Schiller Defendants' counterclaims, in particular their PMPA and Declaratory Judgment Causes of Action, (Fourth Am. Answer and Countercl. ¶¶ 217–220, ECF No. 257).

One purpose of the PMPA is to protect gas station franchisees in their dealings with franchisors, who are typically "large oil corporations and gasoline distributors, and to remedy the disparity in bargaining power between parties to gasoline franchise contracts." *BP W. Coast Prods. LLC v. May*, 447 F.3d 658, 662 (9th Cir. 2006) (quoting *DuFresne's Auto Serv., Inc. v. Shell Oil Co.*, 992 F.2d 920, 925 (9th Cir.1993)).  At the same time, however, the PMPA is designed to provide "adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences."  *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 762 (9th Cir. 1999) (citing S. Rep. No. 95-731, at 18–19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 877).  The PMPA achieves these goals by establishing minimum "standards governing the termination and non-renewal of franchise relationships for the sale of motor fuel by the

/ / /

franchisor or supplier." *May*, 447 F.3d at 662 (quoting *Fresher v. Shell Oil Co.*, 846 F.2d 45, 46 (9th Cir. 1988) (per curiam)).

These minimum standards allow franchisors to terminate or decline to renew an existing franchise relationship only if one of the conditions listed in 15 U.S.C. § 2802(b) occurs, and even then the termination must follow the notification requirements outlined in 15 U.S.C. § 2804. *May*, 447 F.3d at 662–63. One such condition is the "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable . . . ." 15 U.S.C. § 2802(b)(2)(C). The statute defines twelve such events in § 2802(c), including "loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease . . . ." 15 U.S.C. § 2802(c)(4). Thus, one valid ground for a franchisor's termination or nonrenewal of a franchise agreement is the loss of the right to grant possession to the franchisee. *See id.*

If a franchisor terminates a franchise based on loss of its right to grant possession, it must have abided by several requirements. First, the franchisee must have received notice in writing:

> prior to the commencement of the term of the then existing franchise (i) of the duration of the underlying lease; and (ii) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal);

15 U.S.C. § 2802(c)(4)(A). Second, the franchisor generally must notify the franchisee of the termination or nonrenewal in writing at least ninety days before it takes effect. 15 U.S.C. § 2804(a). Third, the franchisor must, with a few caveats, offer during the ninety-day notice period "to assign to the franchisee any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor." 15 U.S.C. § 2802(c)(4)(B).

BP contends that the evidence shows (1) that BP lost its right to grant possession of the premises it leased to Meetra, the Schiller Defendants, and Crossroad; (2) that each of those Defendants received the statutorily required notice before the franchises commenced;

(3) that BP notified these Defendants at least ninety days before the termination/nonrenewal took effect; and (4) that it had no renewal option that it could assign to these Defendants.  Importantly for purposes of this summary judgment motion, BP contends that the Defendants cannot identify any contradictory evidence adequate to give rise to a genuine dispute of material fact with respect to any of these conditions.

The Defendants do not argue that BP did not actually lose the right to grant possession of the various sites or that BP did not provide notice that the underlying leases would expire at least ninety days before they did.  Rather, Meetra argues that: (1) BP had lease renewal options that it was required to offer to assign; (2) the PMPA required BP to notify the Defendants within 120 days after it learned the underlying lease would expire, which BP did not do; and (3) there is a dispute over the timing by which BP provided notice to Meetra of the underlying Master Lease.  (Meetra PMPA Opp'n at 10–17.)  Crossroad raises similar arguments with respect to BP's obligation to offer to assign renewal options and provide notice 120 days after it knew the underlying lease would lapse.  (Crossroad PMPA Opp'n at 3–9.)  The Schiller Defendants argue that BP engaged in a regional market withdrawal, and was therefore required to follow certain other procedures under the PMPA.  (*See, e.g.*, Schiller Opp'n at 5–6, 11, 40.)

### A.    *120 Day Notice*

The PMPA did not require BP to notify the franchisees within 120 days of when it knew it would lose the right to grant possession of the gas station sites.

For most events of the events that allow termination or nonrenewal, the franchisor must give the franchisee notice of termination or nonrenewal within 120 days of when that event occurs.  *See* 15 U.S.C. § 2802(b)(2)(C)(i).  The PMPA lists twelve different "events" that may justify termination or nonrenewal.  *See* 15 U.S.C. § 2802(c)(1)–(12); *Veracka*, 655 F.2d at 449.  Of those twelve, "expiration of the underlying lease (and no other) comes accompanied with its own special notice requirement."  *Veracka*, 655 F.2d at 449.  Then-Circuit Judge Breyer writing for the First Circuit concluded that, when the basis for termination or nonrenewal of a franchise relationship is the loss of the franchisor's right to

grant possession under § 2802(c)(4), the franchisor is only required to follow that section's specific notice provision. *See id.* at 449–50; 15 U.S.C. § 2802(b)(2)(C)(i).  That is, the franchisor must have provided the franchisee with adequate prior notice of the terms of the underlying lease—but is not required to give notice within 120 days of acquiring "actual or constructive knowledge" of the relevant "event." *See Veracka*, 655 F.2d at 449–50.

Although they argue that *Veracka* contradicts the text of the PMPA, (Meetra PMPA Opp'n at 16), Defendants cite no case that breaks with the holding that the 120 day notice period does not apply to the loss of the right to grant possession under § 2802(c)(4).  On the other hand, BP cites to five district court decisions following this rule.  (*See* PMPA Reply at 8 (citing *Patel v. Sun Co., Inc.*, 948 F. Supp. 465, 472 n.4 (E.D. Pa. 1996); *Atkins v. Chevron USA Inc.*, 672 F. Supp. 1373, 1376 (W.D. Wash. 1987); *Zarcone v. Amerada Hess Corp.*, 661 F. Supp. 615, 617 (E.D.N.Y. 1987); *Graeber v. Mobil Oil Corp.*, 614 F. Supp. 268, 272–73 (D.N.J. 1985); *Gaspar v. Chevron Oil Co.*, 490 F. Supp. 971, 975 (D.N.J. 1980)).)  While it is true that most of those authorities predate the 1994 amendments to the PMPA that added the obligation to assign extension options, the text governing notice did not change, and at least one district court has explicitly followed the rule announved in *Veracka* since those amendments. *See Patel*, 948 F. Supp. at 472 n.4. The Defendants have provided no persuasive reason for the Court to break with the reasoning of the courts who have directly addressed this issue.  Thus, BP was not obligated to provide notice to Defendants within 120 days of realizing its lease with Thrifty would expire.

Crossroad does not take issue with the rule in *Veracka*, but instead points to an alternative "event"—the loss of the use of trademarks—that led to the termination/nonrenewal, arguing that this event obligated BP to provide notice within 120 days.  (Crossroad PMPA Opp'n at 9.)  Although it is true that termination or nonrenewal based on the "loss of franchisor's right to grant the right to use the trademark which is the subject of the franchise" is an event that would require a franchisor to give notice within 120 days, *see* 15 U.S.C. § 2802(b)(2)(C)(i) & (c)(6), a "franchisor needs to provide only

13

one valid reason for termination under the PMPA," *PDV Midw. Ref., L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 508 (6th Cir. 2002).   "[N]otice of a legitimate ground for termination is not made ineffective by defective notice for additional grounds for termination." *Id.* (citing *Stuart v. Exxon Co., U.S.A.*, 624 F. Supp. 648, 653–54 (N.D. Tex. 1985)).   Accordingly, because notice was proper with respect to the expiration of BP's lease, it does not matter if notice was improper with respect to BP's anticipated loss of the right to grant use of a trademark.

### B.    *Notice of the Underlying Lease*

There is no genuine dispute that BP gave each defendant subject to the PMPA MSJ adequate notice of the underlying Master Leases.

For termination based on a franchisor's loss of right to grant possession to be reasonable, the franchisor must have given the franchisee notice "in writing, prior to the commencement of the term of the then existing franchise (i) of the duration of the underlying lease; and (ii) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal)." 15 U.S.C. § 2802(c)(4)(A).

Meetra contends there is a dispute of fact over whether BP complied with this requirement.   (Meetra PMPA Opp'n at 13–15.)   More specifically, Meetra states that the "franchise agreements initially did not mention the expiration of any underlying third party leases," (*id.* at 13 (citing Risner Decl., Ex. 131 pt. 1, ECF No. 492-166, at 9–10), and that Meetra was never provided the Master Agreement between BP and Thrifty, (*id.*).   Focusing in on one site in particular, 6800 Lankershim Boulevard, also known as Facility No. 9513, Meetra points out that the franchise agreement was dated March 11, 2009, and the Acknowledgement of Master Lease is dated several months later, November 12, 2009.  (*Id.* (citing Facility No. 9513 Acknowledgement Form, Risner Decl., Ex. 131 pt. 4, ECF No. 492-169, 88; Facility No. 9513 Franchise Agreement, Risner Decl. Ex. 131 pt. 1, ECF No. 492-166, at 9–10, 89).)   Meetra also suggests that BP's execution of "Amendments" to the franchise agreements on the same day as notices of non-renewal were delivered, September

27, 2011, was basically an attempt to correct inadequate notice of BP's underlying ground lease with Thrifty.  (*See id.* at 14.)

First, there is a simple explanation for why Meetra's Acknowledgement Form for Facility No. 9513 is dated after the franchise agreement: Meetra was not the original franchisee.  (*See* PMPA Reply at 9–10.)  The Facility No. 9513 agreement was effective on March 11, 2009 between BP and Behmard & Associate, Inc.  (Facility No. 9513 Franchise Agreement, Risner Decl. Ex. 131 pt. 1, ECF No. 492-166, at 9.)  Behmard & Associate, Inc., assigned the franchise to Meetra Inc. on December 10, 2009.[7]  (Risner Decl., Ex. 131 pt. 1, ECF No. 492-166, at 62–63.)  Thus, the evidence shows that the business entity Meetra, which is the only Meetra Defendant subject to the PMPA MSJ, executed the Acknowledgement Form nearly a month before it assumed and therefore entered into the franchise agreement for that site.

Second, Meetra cites no authority, and the Court is aware of none, stating that a franchisor is obligated to provide the franchisee a copy of the underlying lease.  Rather, the statute requires the franchisor to inform the franchisee about certain terms in the lease that are relevant to the continuance of the franchise agreement.  *See* 15 U.S.C. § 2802(c)(4)(A).  The Acknowledgement of Master Lease forms summarize those terms.  BP was not, therefore, legally obligated to provide the Defendants with a copy of the underlying lease.

Third, as BP clarifies in its Reply, the "Amendments" Meetra refers to simply "updated the Franchise Agreement termination dates to correspond to the expiration date of each Master Lease."  (Reply at 9 n.9 (citing Risner Decl., Ex. 131 pt. 1, ECF No. 492-166, at 60–61).)  In light of the signed forms acknowledging the existence and relevant

---

[7] Mehdi Behmard, one of the so-called "Meetra Defendants," signed on behalf of both Behmard & Associate, Inc. and Meetra Inc.  In any event, the business entity Behmard & Associate is not a party to this litigation.  The Facility No. 9513 Acknowledgement Form Meetra cites was executed by Mehdi Behmard on behalf of Meetra, rather than Behmard & Associate, Inc.  (*See* Risner Decl., Ex. 131 pt. 4, ECF No. 492-169, at 88.)

15

terms of the Master Lease, this amendment does not give rise to a genuine dispute of fact over whether BP notified the franchisees of the underlying ground lease.

In sum, there is no genuine dispute of material fact as to whether BP provided notice of the underlying Master Leases as required by 15 U.S.C. § 2802(c)(4)(A). The uncontroverted evidence shows that it did.

### C.   *Renewal Options*

There is also no disagreement over whether BP's Extension Options were still exercisable during the ninety day notice period preceding the expiration of the underlying leases. They were not. Because BP no longer had the options itself, it had no obligation under the PMPA to offer to assign them to the franchisees.

The PMPA requires franchisors to offer extension options to franchisees that they possess during the ninety-day notice period. *See* 15 U.S.C. § 2802(c)(4)(B). In this case, the renewal options had long since expired when BP gave the Defendants the ninety-day notice. BP declined to exercise its options by July 1, 2010, so they lapsed when that date passed.

The Defendants do not argue that BP possessed the Extension Options during this time, but instead combine their 120-day notice argument with the obligation to offer to assign options under § 2802(c), suggesting that because BP was required to give notice within 120 days of learning it would lose the right to grant possession, it also had to offer to assign options it had during that time period. As the Court already noted, BP was not obligated to give the within-120-days notice, so Defendants' arguments fail to the extent they depend on that notice obligation. In any case, the text of § 2802(c)(4)(B) refers to the "90-day period after notification was given pursuant to section 2804," not the within-120-days notification period, so Defendants' arguments also fail based on the plain language of the statute.

The Defendants further suggest that the circumstances of this case make BP's termination and nonrenewal of these franchises unreasonable. In particular, Meetra suggests that BP's decision not to exercise the Extension Options, to allow the Extension

Options to lapse, and only later to give the franchisees notice of termination and nonrenewal is an "end run" around the PMPA.  (*See* Meetra PMPA Opp'n at 12.)  That is, BP used its "privileged position in the market" to ensure that it would not have to offer to assign these options.  (*See id.* at 12.)  Crossroad also suggests that the existence of these options and BP's failure to offer to assign them makes the termination and nonrenewal unreasonable.  (Crossroad PMPA Opp'n at 7.)

If a franchisor terminates under 15 U.S.C. § 2802(b)(2)(C) based on the occurrence of one of the events listed in 15 U.S.C. § 2802(c), termination is reasonable.  *See Atl. Richfield Co. v. Guerami*, 820 F.2d 280, 283 (9th Cir. 1987) (rejecting the argument that the court must inquire into whether the occurrence of an event listed in § 2802(c) undermined the franchise relationship enough to justify termination/nonrenewal); *see also Joseph v. Sasafrasnet, LLC*, 689 F.3d 683, 690 (7th Cir. 2012) ("Every other circuit court that has addressed the matter has held that the occurrence of an event listed in § 2802(c) provides a franchisor with a per se reasonable basis for terminating a franchise.") (citing *Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 377 (4th Cir. 1992) (per curiam); *Desfosses v. Wallace Energy, Inc.*, 836 F.2d 22, 26 (1st Cir. 1987); *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1573 (11th Cir. 1987); *Atl. Richfield Co.*, 820 F.2d at 283; *Russo v. Texaco, Inc.*, 808 F.2d 221, 225 (2d Cir. 1986); *Lugar v. Texaco, Inc.*, 755 F.2d 53, 57–58 & n.3 (3d Cir. 1985)).

Courts will, however, take a close look at the factual predicates underlying one of the events listed in § 2802(c) before concluding that they are established.  *See, e.g., Mustang Mktg., Inc. v. Chevron Prods. Co.*, 406 F.3d 600 (9th Cir. 2005).  For example, in *Mustang Marketing*, the Ninth Circuit concluded that the franchisor possessed an option— although the franchisor argued it did not—and remanded for the trial court to determine whether the franchisor had in fact offered this option.  *Id.* at 607–08.  With respect to whether the franchisor properly evicted the franchisee based on its purported loss of the right to grant possession, the Ninth Circuit indicated that courts should scrutinize "the franchisor's subjective intent, its continuing control over the marketing premises, and its

actual or eventual right to continued possession." *Id.* at 608 (citing *Hifai v. Shell Oil Co.*, 704 F.2d 1425, 1429 (9th Cir. 1983); *Veracka*, 655 F.2d at 448). In other words, courts should be wary of attempts by franchisors to "end a franchise relationship with one operator while retaining control of the premises." *Id.* at 609 (citing *Hifai*, 704 F.2d at 1429). Notably, in *Mustang Marketing*, the Ninth Circuit reversed the district court's grant of summary judgment because the franchisor's "actions point[ed] to the fact that [it] never intended to leave the premises." *Id.*

By contrast, in this case, there is no factual question of whether BP possessed extension options during the ninety-day notice period and BP did not retain control over or possession of these gas station sites after the underlying leases expired. As for Meetra's assertion that BP positioned itself so that it could not assign these options, Meetra has not identified any evidence from which a reasonable fact finder could reach this conclusion and has not cited any authority explaining the legal significance of structuring a contract to avoid the PMPA's requirement to assign options.

Accordingly, the Court concludes that undisputed material facts show that BP complied with its obligations under the PMPA with regard to its Extension Options and § 2802(c)(4) more generally.

### D. *The Schiller Defendants' Market Withdrawal Theory and BP's Motion to Strike*

Because BP has established that it had a valid reason to terminate these franchises under 15 U.S.C. § 2802, the Court does not need to consider the merits of the Schiller Defendants' argument that BP was engaged in a market withdrawal and failed to comply with the procedures for market withdrawal. *See PDV Midw. Ref., L.L.C.*, 305 F.3d at 508 ("A franchisor needs to provide only one valid reason for termination under the PMPA."). The Court therefore rejects the Schiller Defendants' argument on that basis.

BP moves the Court to strike the Schiller Defendants' Opposition for exceeding the page limitation and to strike references to record evidence for lack of specificity. (Mot. to Strike Schiller Opp'ns, ECF No. 518-1.)

18

Rule 56(c)(1)(A) directs parties in summary judgment motion practice to cite "to particular parts of materials in the record."  "[W]hen a party relies on deposition testimony in a summary judgment motion without citing to page and line numbers, the trial court may in its discretion exclude the evidence."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 775 (9th Cir. 2002); *see also Huey v. UPS, Inc.*, 165 F.3d 1084, 1085 (7th Cir. 1999) ("[J]udges need not paw over the files without assistance from the parties."); *Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (noting that parties must designate specific facts and their location in the record when relying on deposition testimony).

The Schiller Defendants attached 236 pages of deposition testimony from William J. Fry, (*see* Schiller Defs.' Exs. A1–A3, ECF Nos. 506-1–506-3), and 128 pages of deposition testimony from Don Strenk, (*see* Schiller Defs.' Exs. B1–B4, ECF Nos. 506-5–506-8).  The Schiller Defendants submitted 44 pages of briefing, not including tables of contents.  (*See* ECF Nos. 506 & 507.)  With a few exceptions, where this briefing cites evidence in the record, it is inexcusably vague.  For example, on page 16 of the second of the Schiller Defendants' two Opposition briefs, the Schiller Defendants assert that BP allowed the leases to expire because it "had decided to withdraw from the retail gasoline market in [S]outhern California" and that BP never offered to assign to the franchisees its extension option.  (Schiller Opp'n, ECF No. 507, at 16.)  To support this argument with evidence, the Schiller Defendants cite the "Declaration of Scherer with attachments, and Deposition excerpts of Fry and Strenk."  *Id.*  In other words, to support these factual premises, the Schiller Defendants cite generally to more than 350 pages[8] of deposition testimony and "hundreds of pages of declarations and attachments," leaving the Court—and BP—"to guess which evidence supposedly supports the purported fact."  (*See* Mot. to Strike Schiller Opp'ns, ECF No. 518-1, at 7–8.)

/ / /

/ / /

---

[8] Documents attached to the Opposition purport to identify the relevant pages, but even those documents generally direct the Court to more than eighty pages of testimony.

In a rare demonstration of specificity, the Schiller Defendants cite the "excerpt of deposition transcript of Brad Lindskog, Divestment Manger in BP's real estate department, depo pp. 1, 5, 23, 25, 28–30, 89–90, 169–170." (Schiller Opp'n, ECF No. 507, at 11.)  As it turns out, that is every page of Mr. Lindskog's deposition testimony submitted in support of certain Schiller Defendants' Answer and Counterclaim, (ECF No. 18).

While this lack of specificity would warrant granting BP's motion to strike, it does not affect the resolution of BP's PMPA MSJ, and is therefore moot.  Accordingly, the Court **DENIES AS MOOT** BP's Motion to Strike Schiller Oppositions, (ECF No. 518).

### E.   *Conclusion*

There is no genuine dispute that (1) BP lost its right to grant possession of the premises it leased to Meetra, the Schiller Defendants, and Crossroad; (2) each of those Defendants received the statutorily required notice before the franchises commenced; (3) BP notified these Defendants at least ninety days before the termination and nonrenewal took effect; and (4) during the relevant time period, BP had no renewal options it could offer to assign to these Defendants.  Accordingly, the Court **GRANTS** BP's PMPA MSJ as to the remaining active Defendants.

## II.   The Indemnity MSJ

In its Indemnity MSJ, BP moves for summary judgment on its Fourth Claim for Breach of Defendants' Indemnity Obligations and its Fifth Claim for Breach of the Franchise Agreement Guaranties.  (Fifth Am. Compl. ¶¶ 155–162, ECF No. 296-3).  BP contends that franchisees and guarantors are liable for damages related to the various indemnity agreements and guaranties between BP and each defendant identified in Appendix A to the Indemnity MSJ.  (*See* Indemnity MSJ at 5; Indemnity MSJ, App'x A, ECF No. 493-1.)  BP paid Thrifty Oil Co. more than $2.3 million pursuant to their lease and indemnity agreements.  BP now seeks to recover $2,357,728.71 from the franchisee and guarantor Defendants against whom it brought this MSJ, alleging that uncontroverted evidence establishes that these damages are attributable to their breach of the indemnity and guaranty agreements.  (*See* Indemn. MSJ at 5.)

20

The claimed damages come in two varieties.  First, BP seeks to recover $449,060.50 that it says it was required to pay Thrifty related to the Defendants' inappropriately involving Thrifty in this lawsuit.  (Indemn. MSJ at 5, 10.)  Second, BP seeks to recover $1,908,668.21 related to "site condition costs, holdover rent, and ABC license delays directly attributable to Defendants."  (*Id.* at 11–12.)

A breach of indemnity agreement claim is essentially the same as a breach of contract claim.  *See* Cal. Civ. Code § 2772 ("Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person.").  The plaintiff must prove: (1) the existence of an indemnity agreement; (2) plaintiff's performance; (3) "the facts showing a loss within the meaning of the parties' indemnification agreement"; and (4) resulting damage.  *See Four Star Elec., Inc. v. F & H Constr.*, 7 Cal. App. 4th 1375, 1379 (1991); *Travelers Cas. & Sur. Co. of Am. v. Highland P'ship, Inc.*, No. 10CV2503 AJB DHB, 2012 WL 5928139, at *4 (S.D. Cal. Nov. 26, 2012) (citing *First Nat'l Ins. Co. of Am. v. Hunt*, 2011 WL 2173765 *3 (E.D. Cal. 2011)).

The indemnity provisions in the franchise agreements provide:

> Without limitation of any other right or any remedy of BPWCP, whether arising under this Agreement or otherwise, Franchisee agrees to indemnify, hold harmless and defend BPWCP, its parents, subsidiaries, officers, directors and employees, from . . . any damages, claims, costs, expenses, fines or penalties relating to operation(s) . . . on the Premises, arising out of or in connection with any failure or breach by or on behalf of Franchisee respecting any provision of this Agreement, or arising out of Franchisee's use or occupancy of the Premises, Franchisee's operation of the business(es) or Franchisee's use, custody or operation of Loaned Equipment or any other equipment on the Premises . . . .

(Indemn. MSJ SOF ¶ 6.)

Where contracts use the "arising from" language, as the relevant franchise agreements do, "liability will attach if the indemnitor's performance under the contract is 'causally related in some manner to the injury for which indemnity is claimed.'"  *S. Cal. Gas Co. v. Syntellect, Inc.*, No. 08-CV-941-BEN MDD, 2014 WL 334462, at *2 (S.D. Cal.

21

Jan. 28, 2014) (citing *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1050 (2002)), aff'd, 593 F. App'x 732 (9th Cir. 2015).

### A.   *Thrifty Legal Defense Costs*

BP has not established that the indemnity terms in the franchise agreements encompass Thrifty's legal costs.

BP argues the Defendants are liable for the Thrifty defense costs because the indemnity agreements use the language "arising from," and the Thrifty legal costs are causally related[9] to the franchisees' "use or occupancy" of the leased premises.  The Court is not convinced, however, that as a matter of law the contract term "arising under" is as broad as BP suggests.   The fundamental problem is that there is nothing about the indemnity term BP relies upon or the construction BP proposes that would limit its ability to recover costs related to this litigation in any reasonable manner.  For example, nothing in the indemnity term would allow BP to recover Thrifty's litigation costs and attorneys' fees where there is no "factual or legal basis to hold Thrifty accountable," but would prohibit BP from recovering Thrifty's fees if the franchisees' claims were meritorious. Similarly, this construction would entitle BP to recover its own costs and attorneys' fees even if the franchisees proved BP violated the PMPA.   It seems unlikely the parties intended for the franchisees to finance all PMPA-related litigation regardless of who prevailed.

The primary case upon which BP relies, *Southern California Gas Co.*, involved an indemnity term that much more clearly contemplated the type of reimbursement sought in that suit.   *See* 2014 WL 334462, at *1.   The plaintiff sought indemnification for costs associated with a patent infringement lawsuit and settlement.   *Id.* at *1–2.   The term at issue specifically stated that the defendant would indemnify the plaintiff for costs "arising

---

[9] Although BP's brief repeatedly cites the standard as "casually related," (*see, e.g.*, PMPA MSJ at 14, 18; Reply to Crossroad at 4), the primary case upon which it relies, *Southern California Gas Co.*, states that standard for this language as "causally related," *see* 2014 WL 334462, at *2.   The Court therefore assumes that is the construction BP urges.

from (1) actual or alleged infringement . . . of any patent . . . in connection with" the product defendant sold to the plaintiff.  *See id.* at *1.

The causal relationship in this case is more attenuated.  In moving for summary judgment, BP has the burden of presenting evidence that, if uncontroverted at trial, would entitle it to a directed verdict.  The mere existence and language of this term is not evidence that would entitle BP to a directed verdict, and BP has identified no evidence suggesting the parties intended this term to have the broad application BP now asserts.

Additionally, the public policy behind the PMPA suggests the Court should hesitate to read the indemnity term as BP suggests.  Courts may deem terms that contravene the statutory rights granted by the PMPA invalid.  *See Graham Oil Co. v. ARCO Prods. Co.*, 43 F.3d 1244, 1248 (9th Cir. 1994) (holding that an arbitration clause limiting the franchisee's ability to recover exemplary damages and reasonable attorneys' fees and shortened the time in which the franchisee could sue to less than the statute of limitations contravened the PMPA and was therefore invalid) *as amended* (Mar. 13, 1995).  Meetra argues that because the PMPA only allows a franchisor to recover fees if the court finds that the suit was frivolous, the construction of the indemnity term BP proposes would make the term invalid.  (Meetra Indemn. Opp'n at 8 (citing 15 U.S.C. § 2805(d)(3)).)  The fact that the contractual construction BP urges would make the Defendants liable for BP's own attorneys' fees but does not require a finding of frivolousness suggests the parties did not intend for the term to make franchisees liable for any attorneys' fees that would not have been incurred but for the franchisees' use or occupancy of the premises.

BP points out that it is not seeking to recover fees for this litigation and that it is only seeking to recover fees because Thrifty was improperly included.  To have a contractual right to recover these fees, there would need to be a contractual term providing such a right.  The indemnity provision BP cites says nothing about improperly including Defendants, and BP offers no construction of this term that would encompass attorneys' fees incurred

/ / /

/ / /

by Thrifty because it was "improperly" sued, but that would not also encompass BP's and Thrifty's attorneys' fees even in a meritorious suit by the franchisees.

Accordingly, the Court **DENIES** BP's Indemnity MSJ with respect to Thrifty's attorneys' fees.

### B.   *Site Condition and Holdover Costs*

BP has not met its burden of identifying evidence entitling it to judgment as a matter of law with respect to the site condition and holdover costs related to BP's settlement with Thrifty.

BP argues that the Defendants against whom it brought the Indemnity MSJ are liable for damages BP incurred related to its Master Leases with Thrifty.  After the franchisees vacated the premises, Thrifty sought reimbursement from BP for holdover rent, the franchisees' failure to timely transfer liquor licenses, and the costs it or its new lessee paid related to "graffiti on the building structures, fixtures and equipment, holes in building structures, damaged dispenser hoses, costly landscaping . . . , and broken interior/exterior/canopy lighting."  (Indemn. MSJ at 15–16 (citing SOF ¶¶ 36–38).)  BP paid $2,120,881.10 to settle these claims with Thrifty, of which BP contends that these Defendants are liable for $1,908,668.21.

An indemnitee must show that it was liable for the amount for which it seeks indemnification, the liability is covered by the indemnity contract, and the extent of liability for which it seeks indemnification is appropriate.  *Peter Culley & Assoc. v. Super. Court*, 10 Cal. App. 4th 1484, 1497 (1992), *as modified on denial of reh'g* (Dec. 16, 1992).  An indemnitor is liable to the indemnitee for good faith settlements within the scope of an indemnity agreement.  *See Lincoln Gen. Ins. Co. v. Access Claims Adm'rs, Inc.*, 596 F. Supp. 2d 1351, 1374 (E.D. Cal. 2009) ("California has long applied the rule that when there is an agreement to indemnify for liability, the party seeking indemnification need not wait for judgment against it, but may be indemnified for payments made in satisfaction of a settlement."); *see also Mabie & Mintz v. B & E Installers*, 25 Cal. App. 3d 491 (1972).

/ / /

24

A settlement is presumptive evidence that the indemnitee was liable, but this presumption "may be overcome by proof from the indemnitor that the settlement was unreasonable (e.g., unreasonable in amount, entered collusively or in bad faith, or entered by an indemnitee not reasonable in the belief that he or she had an interest to protect)." *Peter Culley & Assoc.*, 10 Cal. App. 4th at 1497.   When the settling indemnitee unreasonably pays too much, "thereby acting as a volunteer," the settlement may be deemed unreasonable.  *See Clayton Ford v. Ford Motor Co.*, 104 Cal. App. 4th 46, 58 (2002).

Understandably, given the sheer number of Defendants in this action and subject to the Indemnity MSJ, BP's motion works in broad generalities, making it difficult to examine on a defendant-by-defendant basis whether BP was liable for each portion of the settlement amount it paid to Thrifty and whether those losses were covered by the indemnity agreements between BP and the franchisors in the first place.

The first of those difficulties is not fatal to BP's Indemnity MSJ.   Following California law, the Court begins with the presumption that BP was liable based on the fact that it settled.  The burden therefore lies with the Defendants to identify evidence showing the settlement was unreasonable, *see Peter Culley & Assoc.*, 10 Cal. App. 4th at 1497, which the Defendants have not done.  Importantly, however, this presumption applies to the question of whether the *indemnitee* was liable *to a third party* for the amount for which it seeks indemnification.  *See id.*  This presumption does not, therefore, save BP with respect to the second difficulty identified—whether each loss was covered by the agreement between BP and the franchisees.

BP attempts to demonstrate the liability of the dozens of Defendants subject to the Indemnity MSJ by using examples of things that may support findings that the losses were covered by the indemnity agreements.  (*See* Wolfe Decl., ECF No. 439-179 ("Thrifty sent site-specific letters to BPWCP identifying items that were not in 'good working order' . . . As an *exemplar* of the types of letters that BPWCP received from Thrifty, attached as Exhibit D is a true and accurate copy of one of the site-specific letters (for Facility No.

9554) that Thrifty sent to BPWCP in the Fall of 2011.") (emphasis added).)  The Court cannot determine the liability of each of these individual Defendants by way of exemplars. BP needs to identify each item of loss for which each franchisee is purportedly liable to even give them a meaningful chance to dispute the facts alleged against them and whether that particular item falls within the indemnity agreement.  For example, BP might have reimbursed Thrifty for a site condition that predated or postdated the franchisee's occupancy, such that it would not actually arise from its use or occupancy of the premises.

BP seeks to hold dozens of Defendants liable and must therefore identify facts that entitle it to summary judgment with respect to each defendant.  Exhibit I to the Wolfe Declaration does not accomplish this task.  (Wolfe Decl., Ex. I, ECF No. 493-238.)  Exhibit I simply lists each property and the total amount BP says is owed from defective conditions, holdover rent, or delays in turning over alcohol licenses.  (*See id.*)  It does not demonstrate that the facts or conditions upon which those figures are based necessarily arise from the franchisees' use or occupancy of the gas station sites.

BP's burden of showing that a loss is covered by an indemnity agreement is not lessened because it sued a lot of Defendants.  Indeed, one of the reasons BP offers to explain why Thrifty leased these gas station sites as a bundle is "efficiency of enforcement of master lessee obligations and direct recourse to remedy any damages suffered by the master lessor."  (PMPA SOF ¶ 5 (citing Esses Report, Risner Decl. Ex. 139, ECF No. 492-178).)  The implication is that it is difficult to recover from many franchisees in an efficient manner, an implication that is born out in the shortcomings of BP's Indemnity MSJ despite BP's having submitted thousands of pages of evidence in support.

In sum, because BP does not identify particular facts entitling it to judgment as a matter of law, the Court **DENIES** BP's Indemnity MSJ.

/ / /

/ / /

/ / /

## CONCLUSION

For the foregoing reasons, the Court:

1.  **GRANTS** BP's PMPA MSJ;

2.  **DENIES** BP's Indemnity MSJ **WITH PREJUDICE** as to the Thrifty legal costs and **WITHOUT PREJUDICE** as to the site condition and holdover costs;

3.  **DENIES AS MOOT** BP's Pacific Expotech MSJ;

4.  **DENIES** BP's Motion to Strike re Timeliness; and

5.  **DENIES AS MOOT** BP's Motion to Strike Schiller Oppositions.

**IT IS SO ORDERED.**

Dated:  July 18, 2016

Hon. Janis L. Sammartino
United States District Judge

27